LAW OFFICE OF MICHAEL HEUMANN
Michael Heumann, CA SBN 299622
901 H Street, Suite 405-5
Sacramento, CA 95814
Telephone: (916) 426-6692
mikeheumann.law@gmail.com
Attorney for Defendant
ZIMNAKO SALAH

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>vs.<br><br>ZIMNAKO SALAH,<br><br>                Defendant. | Case No.: 2:24-CR-0043 DC-1<br><br>DEFENSE OPPOSITION TO GOVERNMENT'S MOTION IN LIMINE NO. 1<br><br>Date:    February 14, 2025<br>Time:    9:30 a.m.<br>Court:   Hon. Dena Coggins |

The defense requests that the court deny the Government's Motion in Limine No. 1, seeking to admit a variety of other acts evidence.

ARGUMENT

On its face, this is a simple case with an element, intent, that is not easily proven by the events of November 12, 2023 alone. The other acts evidence the government seeks to admit to bolster their case are highly prejudicial, at times conflicts with the theory they construct, and rely

1

on speculation to fill gaps by creating a theory that this incident was part of a complicated and long running plot to carry out real bombings at churches.

## BOMB EVIDENCE

The cornerstone of the prosecution's theory is the supposed bomb preparations located in the Colorado storage unit. This is the only significant evidence pointing towards an overall plot to bomb churches. However, the evidence is far from conclusive. In the storage unit, the FBI located propane canisters, nails, tape, batteries, and wires, all items that can be purchased in any store and found in most homes or garages.

As the expert's report provided in discovery explained, a bomb requires several components, one of which is an initiator that "converts electrical current into another form of energy, which is usually heat, to start a reaction in the explosive or incendiary material." No initiator was located, and without an initiator, the items located could not be assembled into a bomb.

Further, most of the items located had explanations that were unrelated to making bombs. When law enforcement located the storage unit they interviewed the storage unit manager, who was upset with Mr. Salah because while he rented the unit there had been evidence Mr. Salah had been staying there overnight, and he had since stopped paying for the storage unit. This was winter in Denver, Colorado, a location known for rather cold temperatures. Mr. Salah would have needed the propane tanks to cook food on his stove (later located by law enforcement) and generate heat. The wires wrapped around the propane tanks would have charged electronic devices, and kept those devices near the heat sources where their batteries would function better.

Significant to the government are that some of the nails were actually located on a strip of tape, indicating partial completion of the project. However, this is also a simple way to keep

nails together so they don't become scattered around a worksite. Also significant was the fact that some of the tape had been wrapped around a canister, and when removed removed strips of labeling that remained on the tape. This tape, however, had no nails attached to it. Further, so much of the labeling was removed that it appears, to defense counsel at least, that no nails were in between the tape and the canister. Consequently, this evidence ultimately consists of a variety of household items that could not have been assembled into a bomb, and which no evidence suggests were all assembled together at once.

Additionally, it is important to remember the context in which these items were discovered. They were essentially refuse left behind after Mr. Salah left the storage unit. If they were bomb components, he would have presumably wanted to keep them or take them with him for use in assembling a bomb later. The probative value of this evidence is therefore weak.

However, the prejudice of this accusation is strong. A bomb hoax, though reprehensible, is far less incendiary a matter than an actual bomb attack. This accusation significantly increases the level of the accusations against Mr. Salah, because a real bomb is obviously far worse than a fake bomb. Further, the uncharged accusation that Mr. Salah was planning and working towards a terror attack may incline the jury to "compromise" on a guilty verdict on the reasoning that although the evidence is weak, the charges are far less significant than the alleged conduct and those two things balance out.

## DRY RUN EVIDENCE

Without the bomb component, there is nothing for Mr. Salah to be conducting dry runs leading up to. Even beyond that, however, the dry run component of the theory is highly speculative and contradictory.

The first issue with the dry run evidence is that it is ambiguous. The government argues

that because Mr. Salah visited a lot of churches, and brought a backpack with him each time, he must have been up to no good. But the other side of that is that if Mr. Salah frequented churches, and always carried a backpack with him, then it is less surprising that he might have inadvertently left it at the Scottsdale and Roseville churches.

Beyond that, the government does not explain what the point of a dry run was in the first place. Normally a dry run is conducted when the activity has some level of difficulty to it, and success is not certain. But the activity here is walking into a church that is open to the public, dropping a backpack somewhere, and leaving. This is not an activity that is difficult to perform, or requires testing to see how it will work out. Certainly it did not require Mr. Salah to test it at four different churches on five occasions just to figure out how to walk into a church with a backpack. If Mr. Salah's intent was to bomb a church, the dry runs would needlessly attract attention.

Arguably, a potential bomber would want to know how a particular church handled security, for example if they scanned backpacks with a metal detector when people entered the church. But this doesn't require leaving the backpack in the church, and it doesn't even require bringing a backpack into the church, because all it requires is walking in and observing the security measures as you enter. Consequently, the dry run component of the other acts evidence is highly speculative and adds little to the government's argument.

Finally, the dry run theory does not match the actual facts of the visits to the other churches. On October 22, 2023, Mr. Salah visited the La Mesa church. He was there for several hours, more than ample time to drop a backpack somewhere and leave. He didn't. This suggests that he wasn't actually in the churches to drop off backpacks, and had the backpacks for another purpose.

4

However, the prejudice from the argument is strong. This turns one incident into four or five incidents, multiplying the severity of the case several times. And, like with the uncharged accusation that Mr. Salah was constructing a bomb, these other uncharged incidents carry the risk that the jury will, though not convinced the case is proven beyond a reasonable doubt, decide that he is only being charged with 20% or 25% of the actual conduct and that a guilty verdict is a compromise between the weak evidence and the uncharged conduct.

The government does note that this dry run evidence could prove identity. However, the evidence on identity is already overwhelming, and the defense does not plan to dispute the issue of identity. The defense anticipates this case will be decided primarily on the issue of intent, and additional evidence to prove identity will be cumulative and should be excluded under Rule 403.

PLANNING EVIDENCE

Mr. Salah bought a motorcycle and a backpack before the incident at the Scottsdale church. The government has presented no evidence that suggests that on the dates when Mr. Salah bought the items, he had begun planning to leave a backpack at that church or even knew that the church existed. Further, it seems improbable that he bought a motorcycle solely to drop off a backpack at a church. When he left his backpack at the Roseville church, he used his own car with his own license plate, making no effort to hide his identity. Similarly, the idea that he planned to use the particular backpack he bought, instead of another backpack, seems unlikely. The government has not articulated anything about the particular backpack that made it important or useful for being left at a church.

However, the defense concedes that the prejudice created by admitting the evidence that Mr. Salah bought a motorcycle and a backpack is small, because there is nothing wrong or suspicious about having these items and the jury would learn he possessed them regardless. The

5

defense is more concerned about the prejudice created by admitting the visit to the Scottsdale church at all, as discussed above. Still, because the evidentiary value of Mr. Salah buying these items is so low, the defense requests that they be excluded.

If the motorcycle purchase is admitted, the defense requests that the license plate of the motorcycle be excluded. The license plate read "KAA8OM", which the defense believes is meant to mean "Kaboom." This license plate was apparently selected by the previous owner, and therefore its meaning should not be attributed to Mr. Salah. This license plate is also most likely a reflection of the excitement and adrenaline associated with motorcycles, as opposed to any reference to bombs. This will, however, draw the connection in the jury's mind between explosions and Mr. Salah, and is therefore highly prejudicial.

## CONSCIOUSNESS OF GUILT EVIDENCE

The license plate evidence has no particular bearing on this case. License plate readers, and police officers, discovered that Mr. Salah sometimes had stolen license plates on his vehicles as he drove around the western United States. However, when he visited the Roseville church and left the backpack, he had his own license plate on the vehicle. When he visited the Scottsdale church and left a backpack, he had the correct license plate on the vehicle. Consequently, he was not trying to hide his identity while committing the alleged crimes. The evidentiary value of the license plates as they pertain to his activities at the churches is therefore very low.

However, the prejudice associated with this evidence is high. Stealing license plates is a crime, a crime with a particular victim who is inconvenienced by the theft. This is likely to upset the jury, and make them think he is a bad person, and is less deserving of the benefit of the doubt built into the requirement that all cases be proven beyond reasonable doubt. The evidence that Mr. Salah cut up his license plates should be excluded for the same reason – it was perhaps an

attempt to conceal a crime, but the crime was stealing license plates, and not anything to do with this case.

Regarding cutting up the hat found at his residence, the hat was similar to the hat worn to the Roseville church but not certainly the same one. Further, it doesn't appear that Mr. Salah cut up the rest of the clothes he wore that day, or the license plate on the car he drove to the church that day, so the connection to the events of this case is speculative and uncertain.

The statements Mr. Salah made to law enforcement are not good candidates for admission as consciousness of guilt because they are not established as intentional lies. First, Mr. Salah stated that he had never been to the Roseville church and persisted in his statement, even when confronted with picture evidence. Later, he denied going to the Colorado church, but then after his memory was refreshed with the picture he explained he had been there. This suggests that he didn't remember either incident, and later remembered the second incident. If he was intentionally lying his story would likely have changed in both cases or neither when confronted.

## MOTIVE EVIDENCE

Finally, the government seeks to admit evidence that Mr. Salah was motivated to conduct a terror attack. The first piece of evidence the government seeks to admit is statements Mr. Salah made to the couple who bought his former home, including criticizing the United States for killing people in Iraq. The United States invaded Iraq in 2003. Mr. Salah resided in the US since before that invasion, and in fact entered the country as an asylee fleeing violence. It is not surprising that wars, which almost inevitably involve substantial civilian casualties, provoke lingering feelings of frustration and resentment that can provoke statements such as Mr. Salah's. However, there is no explanation of why Mr. Salah would have waited almost two decades after the war began if he was spurred into action by this.

7

Beyond this, many Americans, not only asylees from Iraq, are upset by the US decision to invade Iraq. It is regarded by many Americans as an expensive, foolhardy, and poorly thought out war that accomplished little at great expense. Many Americans are likewise frustrated and upset by the United States. The overwhelming majority of these Americans do not go on to commit terror attacks, so the probative value of these statements are low.

Mr. Salah also wrote "Allah, Muhammad" on the wall of the storage unit. The defense submits this has absolutely no evidentiary value. These phrases are common ones repeated by nearly all Muslims, similar to "Jesus" or "God" as figures commonly referenced by Christians.

Mr. Salah also wrote "The stupid Jew" on the storage unit. But nothing in this case has anything to do with Jews, synagogues, or anything regarding the Jewish faith.

However, the prejudice of this statement is high, because it makes Mr. Salah look prejudiced, and may cause the jury to dislike him on that basis.

Mr. Salah's search history on YouTube is likewise of minimal evidentiary value. The Boston Marathon capturing his attention is not surprising because it captured the nation's attention. His concern regarding it is even more understandable because when Muslims commit terror attacks in the United States, misguided people commit attacks against Muslims who had absolutely nothing to do with the attacks and did nothing besides living a law abiding life. Being aware of the things that provoke these attacks is a survival tool for Muslims in America.

More broadly, this evidence regarding motive will substantially complicate the case and unduly consume time and resources. For example, the discovery presented by the government shows that Mr. Salah watched and subscribed to many Youtube videos and channels, as opposed to focusing solely on the ones described by the government. If the government seeks to introduce the portions of Mr. Salah's YouTube viewing history regarding terrorist attacks, then the defense

8

will be required to show the full extent of Mr. Salah's viewing habits, so that the jury can properly understand what his media consumption looked like. The prosecution turned over approximately 80,000 pages of emails discovered on Mr. Salah's phone. The defense does not have a precise count on how many of those emails came from YouTube regarding videos watched by Mr. Salah, but estimates it as hundreds or thousands of videos viewed. A representative sample of all the videos Mr. Salah watched, as opposed to only the ones relating to terrorism, would be extensive. Additionally, the defense would need to contextualize the videos the government suggests point towards terrorism, which would require additional time and resources, and potentially expert testimony.

The same is true for the other evidence regarding Mr. Salah's motive. If the government presents Mr. Salah's comments to the couple that purchased his home or writing on a wall, the defense may need to introduce evidence that gives a fuller and more complete picture of Mr. Salah's character, consuming substantial time and resources on tangential matters that are unlikely to be decisively resolved.

## CONCLUSION

For the reasons stated above, the defense requests that the Government's Motion in Limine No. 1 be denied.


Respectfully submitted,

DATED:  January 21, 2025

By   /s/ Michael Heumann
     MICHAEL HEUMANN
     Attorney for Defendant
     ZIMNAKO SALAH
