1
2
3
4
5
6
7
8               UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,              No. 2:24-cr-00043-DC-1

12                Plaintiff,

13        v.                                ORDER GRANTING IN PART THE
                                            GOVERNMENT'S MOTION *IN LIMINE*
14   ZIMNAKO SALAH,                         NO. 1 AND GRANTING THE
                                            GOVERNMENT'S UNOPPOSED MOTION
15                Defendant.                *IN LIMINE* NO. 2

16                                          (Doc. Nos. 47, 48)

17

18        This matter came before the court on February 14, 2025 for a hearing on two motions *in*

19   *limine* filed by the Government on January 6, 2025. (Doc. Nos. 47, 48.) Specifically, in its motion

20   *in limine* No. 1, the Government seeks to admit "other acts" evidence because that evidence is

21   inextricably intertwined with the charged offense and admissible under Federal Rule of Evidence

22   404(b) for several relevant and permissible purposes. (Doc. No. 47 at 6–7.) In its motion *in limine*

23   No. 2, the Government seeks to admit excerpts from a voluntary, non-custodial interview of

24   Defendant conducted by the Federal Bureau of Investigation ("FBI") on November 21, 2023, and

25   preclude "Defendant from offering additional self-serving hearsay statements that do not

26   implicate the rule of completeness." (Doc. No. 48 at 1–2, 7.) Defendant filed an opposition to the

27   Government's first motion (Doc. No. 49), and he filed a statement of non-opposition to the

28   Government's second motion (Doc. No. 53). Both motions were submitted following oral

1

1  argument. (*See* Doc. No. 54.) For the reasons explained below, the court will grant the

2  Government's first motion *in limine*, in part, and grant the Government's unopposed second

3  motion *in limine*.

**BACKGROUND**

5      Defendant is charged in the superseding indictment with the following two counts: (1)

6  violating 18 U.S.C. § 1038(a)(1)(A) - False Information and Hoax, by "knowingly affix[ing] a

7  backpack to a toilet in the restroom of a church in Roseville, California with the intent to convey

8  the false and misleading information that the backpack contained a bomb"; and (2) violating 18

9  U.S.C. 247(a)(2) – Obstruction of Persons in the Free Exercise of Religious Beliefs, by

10  "knowingly affix[ing] a backpack to a toilet in the restroom of that church in order to convey a

11  bomb threat and thereby obstruct the church's congregants in the enjoyment of their free exercise

12  of religious beliefs." (Doc. No. 37 at 2.)

13      Defendant is charged with the following conduct:

14      On November 12, 2023, the Defendant entered a Christian church in
15  Roseville, California, during the 9:00 am Sunday service. The
   Defendant, wearing a black backpack, walked to the men's bathroom
   where he tied the backpack to a toilet and then left the church. When
16  security staff spotted the backpack, they believed it to be a bomb and
   called 911. The backpack was eventually removed and opened and
17  found to contain a pillow. Church security camera footage shows that
   the Defendant had entered and left the church and visited this same
18  bathroom an additional time—without the backpack—earlier that
   same morning. Street camera footage further shows that the
19  Defendant had driven to the church the morning before the incident,
   parked in the parking lot for roughly 17 minutes, never leaving his
20  car, and then left.

21  (Doc. No. 47 at 7.)

22      The Government contends that Defendant committed the charged offenses as a part of a

23  broader plan and attempt to bomb and terrorize Christian churches. (*Id.* at 4.) In support of its

24  contention, the Government describes "other acts" evidence that it seeks to admit in order to place

25  the charged November 12, 2023 incident in context and allow for a cohesive story to be presented

26  to the jury. (*Id.* at 4–5.) The Government summarizes the "other acts" evidence as follows:

27  /////

28  /////

1

2

3

4

5

6

7

8

9

10

11

12

13

14

Between September and November of 2023, the Defendant rented a storage unit near a church in Colorado; used that storage unit to begin constructing an improvised explosive device ("IED") that would fit in a backpack; and conducted "dry runs" at Christian churches in Scottsdale, Arizona; La Mesa, California; Roseville, California (the subject of the charged violations); and Greenwood Village, Colorado. The Defendant surveilled each church, conducted an initial walk-through to determine security and entrance/exit points, returned with a backpack, and either planted that backpack (Scottsdale and Roseville churches) or attempted to plant that backpack before being confronted by a security officer (La Mesa and Greenwood Village churches). During a search of the Defendant's Colorado storage unit, FBI agents seized IED component parts, including propane gas tanks with protruding electrical wires connected to batteries and duct-taped nails functioning as shrapnel. Search warrant returns from the Defendant's YouTube account revealed that the Defendant had searched "infidels dying" and had watched YouTube videos about the Boston Marathon bombing, which was carried out with IEDs concealed in backpacks. The family who purchased the Defendant's Glendale, Arizona, home told investigators that the Defendant had made statements expressing animus against Christianity and the United States. The Defendant took steps to cover up his conduct—including using stolen and unregistered license plates to make it more difficult for law enforcement to track him; cutting up a hat, clothing, and license plates he used during the incidents; lying to federal, state, and local law enforcement officers; and asking his mother to hide evidence.

15

16

17

(*Id.* at 4.) In its first motion *in limine*, the Government groups the "other acts" evidence into five categories: (1) "dry run" evidence; (2) bomb evidence; (3) planning evidence; (4) consciousness of guilt evidence; and (5) motive evidence. (*Id.* at 7.)

18

19

20

21

22

23

24

25

26

27

28

The Government argues that these categories of "other acts" evidence are "inextricably intertwined with the charged offenses" because the charged incident was not an isolated incident. (*Id.*) That is, "[w]hen placed into its proper context—that the Defendant had, just weeks earlier, surveilled and planted or attempted to plant backpacks at two other Christian churches to which he had no connection, did the same thing at another Christian church just a week later, and had been constructing an IED that could fit into a backpack—a jury could reasonably infer that the Defendant had the requisite criminal intent and that the charged conduct was part of a larger criminal plot." (*Id.* at 4–5.) The Government also argues that even if these categories of "other acts" evidence are not found to be inextricably intertwined with the charged offense, the evidence is still admissible pursuant to Rule 404(b) because the evidence "will be offered for several permitted purposes: to provide the Defendant's motive, intent, preparation and plan, absence of

1  mistake or accident, and consciousness of guilt." (*Id.* at 5.)

2  **LEGAL STANDARD**

3      Pursuant to Rule 404(b) of the Federal Rules of Evidence, "[e]vidence of any other crime,

4  wrong, or act is not admissible to prove a person's character in order to show that on a particular

5  occasion the person acted in accordance with the character," but such evidence "may be

6  admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan,

7  knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(1), (2). "So

8  long as the evidence is offered for a proper purpose, such as to prove intent, the district court is

9  accorded wide discretion in deciding whether to admit the evidence, and the test for admissibility

10  is one of relevance." *United States v. Johnson*, 132 F.3d 1279, 1282 (9th Cir. 1997). "In making

11  admissibility decisions, the court will admit Rule 404(b) evidence if (1) the evidence tends to

12  prove a material point; (2) the prior act is not too remote in time; (3) the evidence is sufficient to

13  support a finding that the defendant committed the other act; and (4) (in cases where knowledge

14  and intent are at issue) the act is similar to the offense charged." *United States v. Verduzco*, 373

15  F.3d 1022, 1027 (9th Cir. 2004).

16      In addition, Rule 404(b)(1)'s prohibition on the use of "other act" evidence does not apply

17  "where the evidence the government seeks to introduce is directly related to, or inextricably

18  intertwined with, the crime charged in the indictment." *United States v. Lillard*, 354 F.3d 850,

19  854 (9th Cir. 2003) (citing *United States v. Williams*, 989 F.2d 1061, 1070 (9th Cir.1993)

20  ("Evidence should not be considered 'other crimes' evidence when the evidence concerning the

21  other act and the evidence concerning the crime charged are inextricably intertwined.") (internal

22  quotation marks and citations omitted)). In the Ninth Circuit, "[t]here are generally two categories

23  of cases in which . . . 'other act' evidence is inextricably intertwined" with the charged offense:

24  (i) when the evidence "constitutes a part of the transaction that serves as the basis for the criminal

25  charge," and (ii) when the evidence is necessary for the Government "to offer a coherent and

26  comprehensible story regarding the commission of the crime," including "to explain either the

27  circumstances under which particular evidence was obtained or the events surrounding the

28  commission of the crime." *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012–13 (9th Cir.

1  1995).

2        "In determining whether particular evidence is necessary to the prosecution's 'coherent

3  and comprehensible story,'" courts consider "whether the evidence bears directly on the charged

4  crime." *United States v. Wells*, 879 F.3d 900, 928–29 (9th Cir. 2018) (citation omitted). "There

5  must be a sufficient contextual or substantive connection between the proffered evidence and the

6  alleged crime to justify exempting the evidence from the strictures of Rule 404(b)." *Vizcarra-*

7  *Martinez*, 66 F.3d at 1013.

8        If evidence is admissible either as direct evidence inextricably intertwined with the

9  charged crime, or as evidence relevant to a permitted purpose under Rule 404(b)(2), then "the

10  district court should admit the evidence unless its prejudicial impact substantially outweighs its

11  probative value." *Johnson*, 132 F.3d at 1282; *see also United States v. Curtin*, 489 F.3d 935, 944

12  (9th Cir. 2007) (explaining that "[o]nce it has been established that the evidence offered serves

13  one of these [Rule 404(b)(2)] purposes, the relevant Advisory Committee Notes make it clear that

14  the 'only' conditions justifying the exclusion of the evidence are those described in Rule 403").

15  Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is

16  substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing

17  the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative

18  evidence." Fed. R. Evid. 403. "'Unfair prejudice' . . . means 'an undue tendency to suggest

19  decision on an improper basis, commonly, though not necessarily, an emotional one.'" *United*

20  *States v. Allen*, 341 F.3d 870, 886 (9th Cir. 2003) (citation omitted).

21  **ANALYSIS**

22  **A.     Government's Motion *in Limine* No. 1**

23        As noted above, in its first motion *in limine*, the Government argues that the five

24  categories of "other acts" evidence is admissible because the evidence "is inextricably intertwined

25  with the charged crimes, and separately, because it is offered to establish one or more

26  permissible, non-propensity purposes under Rule 404(b)." (Doc. No. 47 at 7.) In his opposition,

27  Defendant argues the "other acts" evidence is highly prejudicial, and the context the Government

28  seeks to provide is based "on speculation to fill gaps by creating a theory that [the charged]

incident was part of a complicated and long running plot to carry out real bombings at churches."
(Doc. No. 49 at 1–2.) Defendant also argues that because there are various plausible explanations
for the "other acts" conduct, the probative value of that evidence is weak. (*Id.* at 3.) The
Government counters in its reply brief that "Defendant's explanations for his conduct are
implausible, but even if they were credible, that is a question for the jury, not a basis for exclusion
of otherwise admissible evidence." (Doc. No. 50 at 2.)

The court will address the parties' respective arguments regarding the admissibility of the
"other acts" evidence by category, beginning with analyzing whether the evidence is inextricably
intertwined with the charged conduct and whether the evidence is alternatively admissible for a
permitted purpose under Rule 404(b), and then address whether the evidence should be excluded
under Rule 403.

       1. <u>Dry Run Evidence</u>

The Government seeks to admit evidence that between September and November of 2023,
Defendant committed "dry runs" at Christian churches in Scottsdale, Arizona; La Mesa,
California; and Greenwood Village, Colorado; in which Defendant conducted surveillance of the
churches prior to entering then entered the churches while wearing a black backpack. (Doc. No.
47 at 8.) Specifically, the Government alleges as follows:

In Scottsdale, Defendant entered the church during morning services, left the backpack on
the floor between seats in the worship center, and then left the church. (*Id.*) The Scottsdale Police
Department searched the backpack and found various clothing items. (*Id.*) In La Mesa, Defendant
visited the church twice, eleven days apart. (*Id.*) The first time, Defendant wandered through the
church, looking around for several hours, and this suspicious behavior led the church's preschool
director to alert security officers, who followed Defendant until he abruptly left the church. (*Id.*)
The second time, Defendant approached the kids' ministry area of the church while parents were
dropping off children, which concerned staff members who were suspicious because Defendant
did not have a child with him. (*Id.*) When those staff members confronted Defendant, he told
them he was with the family standing in front of him, which that family denied. (*Id.*) Defendant
abruptly walked away from that area and into the men's bathroom, then the auditorium, then back

1  into the bathroom, and then back towards the kids' area—all while being followed by church

2  security. (*Id.*) Then Defendant, still wearing the backpack, exited the church and drove away.

3  (*Id.*) In Greenwood Village, Defendant's behavior of scoping out the church led a congregant to

4  alert an on-duty sheriff's officer, who observed Defendant retrieving a backpack from his car in

5  the parking lot. (*Id.* at 8–9.) Defendant put on the backpack and walked toward the church

6  entrance, where the officer approached and engaged Defendant in conversation so he would know

7  the officer was watching him. (*Id.* at 9.) Then Defendant, while carrying the backpack, reentered

8  the church, walked toward the bathrooms and choir area, became alarmed by the officer following

9  him, and abruptly left. (*Id.*) Security footage of the Greenwood Village incident shows Defendant

10  entering and scoping out the church first, without the backpack, before returning with the

11  backpack, which is what Defendant did just one week earlier at the Roseville church during the

12  charged incident. (*Id.*)

13       In the pending motion, the Government argues that evidence of these dry runs—of

14  Defendant engaging in the same conduct several weeks before the charged incident and one week

15  after the charged incident—is inextricably intertwined with evidence of Defendant committing

16  the charged conduct at the Roseville church "because each of these incidents are part of the same

17  overarching scheme and therefore part of the same 'transaction' that forms the basis of the

18  criminal charge." (Doc. No. 47 at 9) (citing *United States v. Anderson*, 741 F.3d 938, 949 (9th

19  Cir. 2013) (explaining that "Rule 404(b) does not apply when offenses committed as part of a

20  single criminal episode become other acts simply because the defendant is indicted for less than

21  all of his actions")). The Government also argues that the dry run evidence is admissible because

22  that evidence is necessary for the Government to offer context and a coherent story regarding the

23  commission of the charged crime. (Doc. No. 47 at 10.) Defendant does not meaningfully rebut

24  these arguments in his opposition. The court finds both arguments to be persuasive and agrees

25  that the dry run evidence is admissible as direct evidence and thus, Rule 404(b)'s prohibition on

26  "other acts" evidence does not apply.

27       Even if Rule 404(b) does apply to the dry run evidence, the Government also persuasively

28  argues that this evidence is admissible to prove intent, preparation, plan, and identity under Rule

404(b)(2). (*Id.* at 10–12.) Notably, in his opposition, Defendant acknowledges that the dry run evidence could prove identity, though he argues the evidence on identity is already overwhelming so dry run evidence would be cumulative on that issue. (Doc. No. 49 at 5.) Defendant also emphasizes "this case will be decided primarily on the issue of intent," on which Defendant views the dry run evidence to be weak. (*Id.*) In particular, Defendant suggests various possible explanations to call into doubt his intent, including that the backpacks might have been inadvertently left at the Scottsdale and Roseville churches, and a person intending to bomb a church using a backpack would not need to conduct dry runs because leaving a backpack containing a bomb in a church does not require a high level of difficulty to perform. (*Id.* at 3–4.) However, Defendant's emphasis on these alternative explanations is misplaced. While Defendant may present these alternative explanations to the jury to suggest he lacked the requisite criminal intent, the existence of those possible explanations for his conduct is not a basis to exclude the extrinsic evidence of that conduct. *See Huddleston v. United States*, 485 U.S. 681, 685 (1988) ("Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct."). In addition, for the reasons detailed by the Government in its motion (Doc. No. 47 at 12), the court finds the dry run evidence satisfies the prerequisites for admission under Rule 404(b) because the dry run incidents were not too remote in time, there is ample evidence to support a finding that Defendant committed the dry runs, and the dry run conduct was similar to the conduct in the charged incident.

Because the court finds the dry run evidence to be admissible, the court next considers whether that evidence should nevertheless be excluded under Rule 403. Defendant argues in his opposition that the prejudice is "strong" because admitting the dry run evidence "turns one incident into four or five incidents, multiplying the severity of the case several times," and "these other uncharged incidents carry the risk that the jury will, though not convinced the case is proven by a reasonable doubt, decide that he is only being charged with 20% or 25% of the actual conduct and that a guilty verdict is a compromise between the weak evidence and the uncharged conduct." (Doc. No. 49 at 5.) While the court appreciates the risk of prejudice that Defendant

describes, Defendant has not persuasively argued that such prejudice would be "unfair prejudice," nor that the probative value of the dry run evidence is "substantially outweighed" by that danger, as required for exclusion under Rule 403.

For these reasons, the Government's motion *in limine* to admit the dry run evidence will be granted.

2.    <u>Bomb Evidence</u>

The Government seeks to admit the following evidence, which the parties refer to as the "bomb evidence." (Doc. No. 47 at 12.)

> In between his dry run in Scottsdale, Arizona, and his dry run in La Mesa, California, the Defendant traveled to Denver, Colorado—a 12-hour drive from his home in Arizona, and a place with which the Defendant had no prior connection—and rented a storage unit a short drive from a Christian church, where the Defendant later attempted to plant a backpack before he was confronted by a police officer and left abruptly. During a search of the Defendant's Colorado storage unit, FBI agents seized component parts of an improvised explosive device, including propane gas tanks with protruding electrical wires attached to batteries and with duct-taped nails serving as shrapnel. Defendant's DNA was found on the component parts.

(*Id.* at 12–13.)

The Government argues the bomb evidence is inextricably intertwined with the charged conduct—namely, making a hoax bomb threat—because the bomb evidence will "provide[] the jury with the necessary context to understand why the Defendant kept planting or attempting to plant backpacks in Christian churches." (*Id.* at 13.) That is, "evidence that the Defendant was constructing a bomb small enough to fit in a backpack is critical to the jury's understanding of the relevance of the Defendant's act of planting backpacks in Christian churches." (*Id.*) The Government also argues the bomb evidence is admissible under Rule 404(b) to prove motive, plan, preparation, and intent because that evidence shows that within just a few months of the charged incident, Defendant rented a storage unit near the Greenwood Village church and kept IED component parts in that unit. (*Id.* at 14; Doc. No. 50 at 4.)

In his opposition brief, Defendant acknowledges that the bomb evidence is "significant evidence pointing towards an overall plot to bomb churches." (Doc. No. 49 at 2.) However, similar to Defendant's arguments regarding the dry run evidence, Defendant contends that the

evidence is "far from conclusive" because there are plausible explanations for why Defendant would have propane canisters, nails, tape, batteries, and wires in his storage unit unrelated to making bombs. (*Id.*) For example, Defendant posits he would have needed the propane tanks to cook food on his stove and generate heat; "[t]he wires wrapped around the propane tanks would have charged electronic devices," and the duct-taped nails is "a simple way to keep nails together so they don't become scattered around a worksite." (*Id.* at 2–3.) Defendant also emphasizes that one required component of a bomb, an initiator, was not found during the search of the storage unit, and "without an initiator, the items located could not be assembled into a bomb." (*Id.* at 2.) Here too, Defendant's emphasis on these alternative explanations is misplaced. While Defendant may present these alternative explanations to the jury to suggest these items were merely household items, not IED components, the existence of possible innocent explanations for why he would have these items in his storage unit is not a basis to exclude the evidence of those items. *See Huddleston*, 485 U.S. at 685. In addition, for the reasons detailed by the Government in its motion (Doc. No. 47 at 14), the court finds the bomb evidence satisfies the prerequisites for admission under Rule 404(b) because the storage unit was rented by Defendant and searched by the FBI within a few months of the charged incident so the bomb evidence is not too remote in time, and the DNA evidence on the items found in the unit is sufficient to support a finding that Defendant possessed those items.

For these reasons, the court finds the bomb evidence to be admissible. As for whether the bomb evidence should nevertheless be excluded under Rule 403, Defendant again argues that the prejudice of this evidence is "strong" because "[a] bomb hoax, though reprehensible, is far less incendiary a matter than an actual bomb attack." (Doc. No. 49 at 3.) Defendant further argues that the probative value of the bomb evidence is weak because Defendant left those items in the storage unit rather than bringing those items with him for use in assembling a bomb later. (*Id.*) Defendant contends that "the uncharged accusation that [Defendant] was planning and working towards a terror attack may incline the jury to 'compromise' on a guilty verdict on the reasoning that although the evidence is weak, the charges are far less significant than the alleged conduct and those two things balance out." (*Id.*) The Government counters in its reply brief that the bomb

evidence is not unfairly prejudicial and has high probative value given the evidence's direct

relation to the charged crime. (Doc. No. 50 at 5.) The Government also emphasizes that "evidence

of acts that, standing alone, may be offensive to the jury are consistently admitted when they are

relevant to the charged crime," as is the case here with the bomb evidence and the charged crime

of a hoax bomb threat. (*Id.*) Having considered the parties' arguments, the court agrees with the

Government that the bomb evidence's prejudicial impact does not substantially outweigh its

probative value, as required for exclusion under Rule 403.

For these reasons, the Government's motion *in limine* to admit the bomb evidence will be

granted.

3.     Planning Evidence

The Government seeks to admit evidence that Defendant planned trips to Christian

churches in Arizona, California, and Colorado by taking the following affirmative steps: (1)

purchasing "a 2020 Kawasaki motorcycle on August 28, 2023, and a black backpack on

September 1, 2023—shortly before he used those items during the incident in Scottsdale,

Arizona"; and (2) renting "a storage unit in Denver, Colorado—a location to which he had no

prior connection—and used that storage unit to build and store an IED (collectively, the 'planning

evidence')." (Doc. No. 47 at 14–15.)

The Government argues this planning evidence is admissible because "Defendant

acquired the motorcycle, backpack, and storage unit as part of his overall scheme to bomb and

terrorize Christian churches," and this evidence will "allow the jury to place these incidents in

their proper context"—that the dry runs were planned, not just spontaneous visits to churches.

(*Id.* at 15.) The Government contends the planning evidence shows that Defendant "planned

ahead and gathered supplies in advance" of his dry runs. (*Id.*)

In his opposition, Defendant "concedes that the prejudice created by admitting the

evidence that [Defendant] bought a motorcycle and a backpack is small, because there is nothing

wrong or suspicious about having these items and the jury would learn he possessed them

regardless." (Doc. No. 49 at 5.) However, Defendant requests that the license plate of the

motorcycle be excluded because the license plate "KAA8OM," which could be construed as

"Kaboom," may lead the jury to draw a connection between explosions and Defendant, which is highly prejudicial. (*Id.* at 6.) In its reply brief, the Government clarifies that it "will not argue or suggest to the jury that the motorcycle's license plate itself has anything to do with Defendant's plot, but unless the Defendant stipulates to identity, the [G]overnment does intend to use that license plate to prove that the Defendant was the masked man who planted a backpack at the Scottsdale church." (Doc. No. 50 at 6.)

At the February 14, 2025 hearing on the pending motions, counsel expressed a willingness to meet and confer to see if a stipulation could be reached with regard to the license plate. On February 25, 2025, the parties filed a notice of Stipulation No. 1, in which they agree "Defendant, Zimnako Salah, is the man dressed in black clothing, wearing a helmet and black backpack, and riding a motorcycle, in the parking lot of the Scottsdale Bible Church, in Scottsdale, Arizona, on September 24, 2023." (Doc. No. 55-1.) Further, in consideration for that stipulation, the Government: (1) agrees to blur or redact any photograph of Defendant Salah's motorcycle with the license plate, "KAA80M"; (2) agrees not to call a witness, S.M., to testify that he sold that motorcycle to Defendant; and (3) agrees not to introduce additional exhibits, including Facebook marketplace records, license-plate reader hits, and Department of Motor Vehicle records, "to establish that Defendant Salah purchased the motorcycle from S.M. and used it to drive to a Christian church in Scottsdale, AZ, on September 24, 2023." (Doc. No. 55 at 2.)

In light of the parties' Stipulation No. 1, it appears that the Government's motion to admit the planning evidence with regard to the motorcycle has been rendered moot. As for the planning evidence regarding the backpack and the storage unit, the Government's motion will be granted because the court finds this evidence to be admissible under Rule 404(b) and not subject to exclusion under Rule 403 for the reasons stated by the Government.

### 4.    Consciousness of Guilt Evidence

The Government seeks to admit "evidence that the Defendant obstructed and attempted to obstruct the investigation into his crimes by: (1) attempting to conceal his location from law enforcement by switching license plates on his vehicles and using a stolen license plate; (2) cutting up a hat and stolen license plates; (3) asking his mother to hide evidence; and (4) making

12

false statements to federal agents (collectively, the 'consciousness of guilt evidence')." (Doc. No. 47 at 16.). In its motion, the Government details this evidence as follows:

> The FBI conducted a voluntary interview with the Defendant on November 21, 2023. When asked about his visit to the church in Roseville, California, the Defendant claimed that he went to the church with a man who he had met at a gas station and who had told him that he might be able to get clothes at the church. The Defendant stated that "nothing happened" at the church, that he arrived and left with a backpack, and that [he] did not leave a backpack at the church. The FBI agent explained to the Defendant that he was caught on surveillance video entering the bathroom wearing the backpack and leaving the bathroom without the backpack. When the FBI agent showed the Defendant a still shot from that surveillance footage, the Defendant denied that it was him and accused the agent of photoshopping the image. During the same interview, the Defendant initially denied going to any churches in Colorado. When the FBI agent showed him a still shot from the bodycamera footage of the police officer who confronted him outside the Christian church in Colorado, the Defendant admitted that he had been to that church but denied that anything happened there.

> After the voluntary interview, FBI agents searched the Defendant's home and found evidence linking him to incidents at Christian churches, including: (1) a 2020 Kawasaki motorcycle with license plate KAA80M—the same motorcycle the Defendant used to travel to and from the Christian church in Scottsdale, Arizona; (2) a black hat that has been cut into pieces and which matched the black hat the Defendant wore during the incident at the Roseville church; and (3) several stolen license plates (also cut into pieces) found in a bag in the Defendant's bedroom—a bag the Defendant later asked his mother to hide from authorities.

> On November 28, 2023, the Defendant was arrested in the San Diego area for driving with a stolen license plate, possession of a loaded gun without being a registered owner, and carrying a loaded firearm in a public place. While in custody following his arrest, the Defendant placed a phone call to his mother, in which he asked her to find a certain bag and move it out of sight. Unbeknownst to the Defendant, the bag he was referring to—which contained cut-up license plates—had already been seized by federal agents executing a search warrant at his home.

(*Id.* at 16–17.) The Government contends the consciousness of guilt evidence should be admitted as direct evidence because the evidence shows Defendant knew his conduct was illegal. (*Id.* at 17.)

With regard to the false statements Defendant made to the FBI during his voluntary interview, the court agrees that such evidence is directly relevant to the charged incident and probative of his consciousness that his conduct—specifically, conducting the dry runs and

1  attempting to leave behind a backpack at the churches—was illegal. In his opposition, Defendant

2  asserts that the statements suggest Defendant did not remember the incidents, not that Defendant

3  intentionally lied to law enforcement during the interview regarding his presence at the churches.

4  (Doc. No. 49 at 7.) While Defendant may present his version of the interview and attempt to

5  persuade the jury that he did not intentionally lie during the interview, the fact that he changed his

6  story during the interview after being confronted with photographs of his presence at the churches

7  is sufficient evidence to support a finding that Defendant was conscious of his guilt. Thus, the

8  court will grant the Government's motion to admit Defendant's statements made during the FBI

9  interview as evidence of Defendant's consciousness of guilt.

10      With regard to the cut-up black hat, Defendant acknowledges in his opposition that the

11  black hat was similar to the black hat he wore to the Roseville church, but he emphasizes the cut-

12  up hat is not certain to be the exact hat worn during the incident. (Doc. No. 49 at 7.) The court

13  finds that such evidence is probative of Defendant's consciousness of guilt because that black hat

14  was similar to the hat the Defendant wore during the charged incident at the Roseville church.

15  Again, Defendant may certainly emphasize this point to the jury, but the conceded fact that the

16  cut-up black hat found in his residence is similar to the hat he wore at the Roseville church is

17  sufficient evidence to support a finding that Defendant was conscious of his guilt—i.e., that he

18  knew his conduct of strapping a backpack to a toilet in the Roseville church bathroom to convey a

19  bomb threat was illegal. Thus, the court will grant the Government's motion to admit the cut-up

20  black hat as evidence of Defendant's consciousness of guilt.

21      With regard to the stolen license plates, switching of license plates, cutting up license

22  plates, and asking his mother to hide a bag containing cut-up license plates (collectively, "license

23  plate evidence")—the court does not find the Government's arguments in support of admissibility

24  of this evidence to be persuasive because that evidence speaks to consciousness of guilt of a

25  *different* crime (theft) not the charged crime (hoax bomb threat). The court agrees with Defendant

26  that "[t]he license plate evidence has no particular bearing on this case" (Doc. No. 49 at 6);

27  notably, Defendant used his own license plate during the dry run in Scottsdale and during the

28  charged incident in Roseville. In its reply, the Government asserts the license plate evidence is

14

relevant because one of the three cut-up license plates was stolen from a Toyota Prius in November 2023 in Sacramento, California (18 miles from the church in Roseville) and another plate was stolen from a Toyota Prius in November 2023 in Glendale, Colorado (8 miles from the church in Greenwood Village). (Doc. No. 50 at 6, n.1.) The Government asserts "[a] jury could reasonably infer from the foregoing evidence that the Defendant stole license plates from Priuses parked near churches where he conducted dry runs so he could avoid detection when driving home." (*Id.* at 6.) The Government's assertion is undercut, however, by the fact that Defendant used his own plates on his Prius during those incidents. Under these circumstances, the probative value of such evidence in establishing consciousness of guilt is minimal. The court also notes the Government has described ample evidence of Defendant's physical presence at the churches during the dry runs, including security camera footage. Thus, to the extent the license plate evidence is offered to establish Defendant's presence at the incidents by showing Defendant was in the general area of those churches (18 miles away and 8 miles away), that evidence has relatively low probative value.

Even if the license plate evidence was deemed admissible under Rule 404(b), the court nevertheless finds exclusion appropriate under Rule 403 because the prejudicial impact of that evidence substantially outweighs its low probative value. The court is persuaded by Defendant's argument that the risk of unfair prejudice from this evidence is high because stealing license plates is a crime that inconveniences victims, and jurors may be upset and view Defendant as a bad person, as a thief who is less deserving of the benefit of the doubt. (Doc. No. 49 at 6.) Relatedly, there is a risk of unfair prejudice from the evidence that Defendant cut up those license plates and asked his mother to hide the bag containing the license plates because the jury may similarly be influenced by Defendant's conduct in attempting to conceal a crime—albeit not the charged crime—and use that evidence as a reason to find Defendant guilty of the charged crime. *See United States v. Pridgette*, No. 1:13-cr-0281-EJL, 2014 WL 12623413, at *3–4 (D. Idaho July 10, 2014) (finding evidence of drug use and the presence of illegal drugs unduly prejudicial and not "inextricably intertwined" with the charged offenses of counterfeiting access devices, possession of a firearm, and transportation of a stolen vehicle); *United States v. Cloud*, No. 1:19-

15

cr-02032-SMJ, 2022 WL 575743, at *3–4 (E.D. Wash. Feb. 23, 2022) (excluding evidence of stolen rifle, stolen vehicle, and drug consumption because that evidence was not "inextricably intertwined" with the charges for murder, was not admissible as 404(b) evidence, and its probative value was outweighed by potential prejudice); *United States v. Thomas*, No. 1:17-cr-00296-DAD-BAM, 2019 WL 3285801, at *2–3 (E.D. Cal. July 22, 2019) (denying motion *in limine* seeking to admit evidence of the defendant's gang affiliation because the government failed to show the evidence was "inextricably intertwined" with the charged drug trafficking offenses, the evidence was not admissible under Rule 404(b), and any slight probative value was outweighed by unfair prejudice).

For these reasons, the court will deny the Government's motion to admit the license plate evidence.

> **5.**    <u>Motive Evidence</u>

Lastly, the Government seeks to admit evidence of Defendant's motive, including: "(1) anti-American rhetoric the Defendant made to the couple who bought his former home, (2) pro-Muslim statements the Defendant spray painted on the wall of his storage unit, and (3) YouTube searches and videos about killing infidels and the Boston Marathon bombing (collectively referred to as the 'motive evidence')." (Doc. No. 47 at 18.) Specifically, the Government intends to elicit testimony from the couple who bought Defendant's mother's home just a few months before the charged incident and had several interactions with Defendant in which he acted aggressively and erratically. For example, during one interaction, the homebuyer wore a hat with an American flag on it, and Defendant asked the homebuyer if he liked the flag, to which he replied he did, and Defendant responded, "Fuck this country. I hate America. This country went to Iraq and killed a lot of people." (*Id.*) The Government also intends to introduce a photograph of a wall inside Defendant's storage unit that has a spray-painted message in Defendant's native Kurdish language, reading: "Allah, Muhammad" and "The stupid Jew." (*Id.*) Lastly, the government plans to introduce evidence of Defendant's YouTube search history from 2019 showing he repeatedly searched for "infidels dying" and "ISIS killing people," watched dozens of videos of terrorist attacks, watched a YouTube video titled "Does Qur'an say kill infidels

1    wherever you encounter them?", and watched multiple YouTube videos about the Boston

2    Marathon bombing (an attack which was carried out with IEDs placed in backpacks). (*Id.* at 18–

3    19.)

4        The Government argues the motive evidence—evidence of Defendant's religious

5    extremism and anti-American animus—is admissible as direct evidence to prove Defendant's

6    motive and intent to commit the charged crimes: making a hoax bomb threat and obstruction of

7    persons in the free exercise of religious beliefs. (Doc. Nos. 47 at 19; 50 at 7.) In his opposition,

8    Defendant contends the motive evidence has low probative value because: (i) many Americans

9    are upset by the United States' invasion of Iraq, so Defendant's statements to the homebuyers do

10   not indicate an anti-American animus; (ii) "Allah, Muhammad" is a common phrase used by

11   Muslims; (iii) "this case has nothing to do with the Jews, synagogues, or anything regarding the

12   Jewish faith"; and (iv) viewing YouTube videos of the Boston marathon bombing and terrorist

13   attacks is understandable because "[b]eing aware of the things that provoke these attacks is a

14   survival tool for Muslims in America." (Doc. No. 49 at 8.) The court finds Defendant's

15   contentions to be largely unavailing.

16       First, as to Defendant's statements to the homebuyers, evidence that Defendant

17   aggressively shouted his hatred for America after seeing the American flag hat worn by the

18   homebuyer is probative of Defendant's motive and intent in committing the charged conduct,

19   even if his hatred is premised on the United States' invasion of Iraq. Moreover, as the

20   Government emphasizes in its reply brief, "[t]hat some may find the Defendant's views toward

21   America offensive is not a basis to exclude the evidence." (Doc. No. 50 at 7) (citing *United States*

22   *v. Allen*, 341 F.3d 870, 886 (9th Cir. 2003) (concluding that "although prejudicial, the skinhead

23   and other white supremacy evidence was not unfairly so and properly was admitted to prove

24   racial animus"); *United States v. Springer*, 753 F. App'x 821, 828 (11th Cir. 2018) ("The

25   potential prejudicial value of references to Springer's pro-ISIS sympathies is not lost upon us. But

26   that evidence retains a sufficiently countervailing probative value given its importance in

27   demonstrating Springer's statements were 'true threats.'"). In addition, the court does not find the

28   probative value of the evidence of anti-American animus to be substantially outweighed by a

17

1    danger of unfair prejudice, as Defendant's statements to the homebuyers is not more

2    inflammatory than the charged conduct. *See United States v. Abu Khatallah*, No. 14-cv-00141-

3    CRC, 2017 WL 11493960, at *2 (D.D.C. Sept. 7, 2017) ("The defendant's statements that the

4    United States is an enemy, that America is the root of the world's evil, and that the Mission was a

5    spy base are highly probative in that they provide a motivation for defendant to have committed

6    the attacks. Nor is this probative value substantially outweighed by any unfair prejudice; these

7    alleged statements are no more inflammatory than the criminal conduct that the defendant is

8    already charged with."). Thus, the court will grant the Government's motion to admit evidence of

9    the statements Defendant made to the homebuyers.

10        Second, as to the spray-painted phrase "Allah, Muhammad," Defendant contends this

11    phrase as "absolutely no evidentiary value." (Doc. No. 49 at 8.) But the evidence at issue is not

12    that Defendant used a phrase that Muslims commonly say to reference a figure like "God" or

13    "Jesus"; rather, this phrase was spray-painted on the wall of the storage unit Defendant rented just

14    months before the charged incident and in which Defendant possessed several items that the jury

15    could infer are IED components. Taken in context, the probative value of this evidence to show

16    Defendant's motive and intent is not substantially outweighed by any unfair prejudice.

17        Third, in contrast to the common "Allah, Muhammad" phrase, which has probative value

18    in context and does not carry a risk of unfair prejudice, the spray-painted phrase "the stupid Jew"

19    is not relevant to the charged conduct and carries a risk of unfair prejudice in that the jury may

20    improperly base their decision on their dislike of Defendant's anti-Jewish views. Notably, in its

21    reply brief, the Government does not offer any argument to rebut Defendant's assertion that this

22    evidence is irrelevant and prejudicial. Accordingly, while the court will grant the Government's

23    motion to admit photographs that show the spray-painted phrase "Allah, Muhammad," the

24    Government's motion to admit photographs showing the phrase "the stupid Jew" will be denied.

25    Thus, any such photographs of that wall in the storage unit must blur out the phrase "the stupid

26    Jew."

27        Fourth and finally, as for the YouTube searches and videos, the court is persuaded by the

28    Government's assertion that "the fact that Defendant viewed videos in which a bombing was

1    carried out by concealing the bomb in a backpack is clearly probative to charges that the

2    Defendant placed a hoax backpack bomb in a church bathroom." (Doc. No. 50 at 8.) In

3    countering Defendant's argument that Muslims in America would watch such videos to stay

4    informed and protect themselves from retaliatory attacks on Muslims, the Government asserts that

5    "Defendant did not simply click on a few links to keep up with the news; he searched dozens of

6    times for videos depicting 'infidels dying' and 'ISIS killing people,' he watched graphic videos of

7    the murder of innocent civilians, and he watched videos discussing the morality of murdering

8    non-Muslims, including a video titled 'Does Qur'an say kill infidels whenever you encounter

9    them?'" (*Id.*) In light of these details, the court finds Defendant's YouTube search and viewing

10    history of these videos to be probative of Defendant's intent and motive in committing the

11    charged conduct and admissible on that basis. *See United States v. Abu-Jihaad*, 630 F.3d 102, 134

12    (2d Cir. 2010) (affirming the district court's decision to admit into evidence excerpts of videos

13    the defendant purchased because the pro-jihadist and violent content of the videos was relevant to

14    understanding the defendant's motive and intent).

15    　　　　As for whether the evidence should nevertheless be excluded under Rule 403, it is worth

16    noting that Defendant does not advance any arguments regarding risk of prejudice from

17    admission of these YouTube searches and videos. Instead, Defendant argues that admission of the

18    YouTube videos would unduly consume time and resources because Defendant would seek to

19    admit hundreds or thousands of videos to show "the full extent of [his] viewing habits, so that the

20    jury can properly understand what his media consumption looked like." (Doc. No. 49 at 8–9.)

21    This argument is not well-taken. As the Government explained at the February 14, 2025 hearing,

22    the Government will not be arguing or suggesting that Defendant searched for and viewed *only*

23    pro-ISIS terrorist videos or even that Defendant *primarily* or *predominately* searched for such

24    videos. Thus, the court is not persuaded that the video evidence should be excluded on the ground

25    that its probative value is substantially outweighed by a danger of wasting time.

26    　　　　For these reasons, the Government's motion to admit the YouTube video evidence will be

27    granted.

28    /////

1  **B.      Government's Motion *in Limine* No. 2**

2        In its second motion *in limine*, the Government seeks to: (i) admit excerpts of the FBI's

3  November 21, 2023 voluntary, non-custodial interview of Defendant, which was audio-recorded,

4  because Defendant's statements during that interview are admissible as statements of a party

5  opponent under Federal Rule of Evidence 801(d)(2)(A), and (ii) preclude "Defendant from

6  offering additional self-serving hearsay statements that do not implicate the rule of

7  completeness." (Doc. No. 48 at 1–2, 7.)

8        As noted above, Defendant filed a statement of non-opposition, stating Defendant "does

9  not oppose the form in which the statements detailed in the Government's Motion in Limine 2 are

10 presented, or their status as statements by a party opponent." (Doc. No. 53 at 1.) Defendant also

11 does not express any intention to offer any of his own statements during that interview, based on

12 the rule of completeness or otherwise.

13       Rule 801(d)(2)(A) provides that an opposing party's statement is "not hearsay." Fed. R.

14 Evid. 801(d)(2)(A) ("A statement that meets the following conditions is not hearsay: . . . The

15 statement is offered against an opposing party and was made by the party in an individual or

16 representative capacity."). Thus, the Government may offer Defendant's own statements made

17 during the FBI interview and those statements would not be inadmissible on hearsay grounds.

18 Defendant, on the other hand, may not offer his own statements because those statements

19 constitute hearsay.

20 /////

21 /////

22 /////

23 /////

24 /////

25 /////

26 /////

27 /////

28 /////

1    For these reasons, the court will grant the Government's unopposed second motion *in*

2    *limine* to admit excerpts of the audio recording[1] of the FBI's interview of Defendant on

3    November 21, 2023.

**CONCLUSION**

5    For the reasons explained above,

6    1.    The Government's motion *in limine* No. 1 (Doc. No. 47) is GRANTED, IN PART,

7    as follows:

8    a.    The Government's motion to admit the dry run evidence and the bomb

9    evidence is GRANTED;

10    b.    The Government's motion to admit the planning evidence regarding the

11    backpack and the storage unit is GRANTED;

12    c.    The Government's motion to admit the planning evidence regarding the

13    motorcycle is DENIED as having been rendered moot by the parties'

14    Stipulation No. 1 (Doc. Nos. 55, 55-1);

15    d.    The Government's motion to admit the consciousness of guilt evidence

16    regarding false statements Defendant made during his FBI interview and

---

[1] The court notes that "[a] government-prepared transcript may be used by the jury to follow a tape recording where the district judge reviews the transcript for accuracy, the agent who participated in the taped conversation testifies to its accuracy, and the district judge gives the jury a limiting instruction." *United States v. Rodriguez*, 24 F.3d 251 (9th Cir. 1994). Here, the court anticipates instructing the jury using Ninth Circuit Model Criminal Jury Instruction for "Transcript of Recording in English," which states:

> You [are about to [hear] [watch]] [have [heard] [watched]] a recording that has been received in evidence. [Please listen to it very carefully.] Each of you [has been] [was] given a transcript of the recording to help you identify speakers and as a guide to help you listen to the recording. However, bear in mind that the recording is the evidence, not the transcript. If you [hear][heard] something different from what [appears][appeared] in the transcript, what you [hear][heard] is controlling. [[After] [Now that] the recording has been played, the transcript will be taken from you.]

Ninth Circuit Model Criminal Jury Instruction 2.6 (current as of November 2024); *see also United States v. Franco*, 136 F.3d 622, 626 (9th Cir. 1998) ("When tapes are in English, they normally constitute the actual evidence and transcripts are used only as aids to understanding the tapes; the jury is instructed that if the tape and transcript vary, the tape is controlling.").

21

1       the cut-up black hat is GRANTED;

2       e.      The Government's motion to admit the consciousness of guilt evidence

3               regarding the stolen license plates, switching of license plates, cutting up

4               license plates, and asking his mother to hide a bag containing cut-up

5               license plates is DENIED;

6       f.      The Government's motion to admit the motive evidence regarding

7               Defendant's statements to the homebuyers, the spray-painted phrase

8               "Allah, Muhammad" on the wall of Defendant's storage unit, and

9               Defendant's YouTube video search and viewing history is GRANTED;

10      g.      The Government's motion to admit the motive evidence regarding the

11              spray-painted phrase "the stupid Jew" on the wall of Defendant's storage

12              unit is DENIED; and

13      2.      The Government's motion *in limine* No. 2 (Doc. No. 48) is GRANTED.

16      IT IS SO ORDERED.

17      Dated:   **March 3, 2025**

        Dena Coggins
18      United States District Judge